## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| | Criminal No. 22-322 (RAM) |
| v. | |
| **JONATHAN VICENTE VAZQUEZ** | |
| Defendant. | |

## REPORT AND RECOMMENDATION

### I.    Introduction

On July 14, 2022, Jonathan Vicente-Vázquez was charged with violations of 18 U.S.C. § 922(g)(1) (prohibited person in possession of ammunition). Docket No. 1. Defendant filed a motion to suppress evidence seized during a traffic stop, including evidence obtained after the search of the vehicle driven by him and statements made by him before and after his arrest. Docket No. 29. The Government opposed. Docket No. 31.

The motion was referred to the undersigned for a hearing and Report and Recommendation. Docket No. 36. An evidentiary hearing was held on March 5 and 6, 2024. See Docket Nos. 45-46. The Government called Puerto Rico Police Bureau ("PRPB") Agent Roberto Casul-Claudio ("Casul-Claudio"), United States Probation Officer Tanya Rivera ("USPO Rivera"), and Bureau of Alcohol, Tobacco, and Firearms ("ATF") Task Force Officer Flavio Rodríguez ("TFO Rodríguez"). Defendant testified under oath. Evidence was admitted. Both parties filed post-hearing briefs. Docket Nos. 66-67. After carefully considering the evidence and arguments, the undersigned recommends that Defendant's motion to suppress be **DENIED**.

### II.    Factual Background

The following account is drawn from the credible evidence received at the suppression hearing.

Prior to July 12, 2022, the United States Probation Office ("USPO") received information from the PRPB that Defendant, who was under conditions of release, was the subject of an investigation concerning a shooting in Cayey. Transcript of Suppression Hearing on March 5, 2024 at Docket No. 58 ("Day 1 Tr.") 68 lines 15-25; 69 lines 1-6; 91 lines 18-24. On July 12, 2022, at 9:50 a.m., USPO Rivera met with Defendant in the USPO office in San Juan to discuss his conditions of release. Id. 63 lines 10-25; 64 lines 9-10. These conditions include Special Condition No. 7 in Crim. No. 14-384 and Special Condition No. 10 in Crim. No. 16-773, which provide that the person, property, or vehicle of Defendant can be searched if the USPO acquires reasonable suspicion concerning unlawful conduct by Defendant. Government Exhibit 17. Defendant left the USPO office around 10:30 a.m. Day 1 Tr. 94 lines 19-21. The PRPB was conducting a surveillance of Defendant as he left. Id. 94 lines 1-9.

On that same day, Casul-Claudio was informed of a plan to investigate and conduct surveillance of Defendant. Id. 11 lines 2-5; 42 lines 17-19. Casul-Claudio was given a description of the vehicle that would be driven by Defendant. Id. 52 lines 16-17. Casul-Claudio then proceeded to the area of Plaza Las Américas in San Juan. Id. 11 lines 21-24. He saw the vehicle driven by Defendant on the public road and prepared to conduct a traffic stop because the window tints of the vehicle appeared to exceed the legal limit. Id. 12 lines 8-11; 13 lines 23-25; 32 lines 12-19. Casul-Claudio asked marked police motorcycles to stop Defendant because he was in an unmarked unit and the motorcycles had light bars and sirens. Id. 53 lines 15-20. Casul-Claudio requested the services of a K-9 and a photometer unit of the PRPB. Id. 19 lines 2-3. Defendant stopped the vehicle and Casul-Claudio approached the front passenger window. Id. 12 lines 19-23. He informed Defendant of the window tint violation and asked Defendant for his driver's license and the registration of the vehicle. Id. 14 lines 13-17. Defendant did not have a driver's license. Id. Neither did the passenger. Id. 16 lines 23-24. The K-9 unit arrived within several minutes of the traffic stop. Id. 19 lines 4-6; 54 lines 7-10. By that time, Defendant had yet to be given the traffic ticket. Id. 55 lines 11-16.

Casul-Claudio asked Defendant to step out of the vehicle. Approximately five minutes passed from the time Casul-Claudio stopped Defendant and asked him to step out of the vehicle. Day 1 Tr. 19 lines 9-11; Transcript of Suppression Hearing on March 6, 2024 at Docket No. 59 ("Day 2 Tr.") 18 lines 7-14. The K-9 marked on the vehicle. Day 1 Tr. 20 lines 3-6; Day 2 Tr. 29

United States v. Vázquez
Criminal No. 22-322 (RAM)
Report and Recommendation

lines 22-23. Casul-Claudio asked Defendant for consent to search the vehicle and gave him verbal
<u>Miranda</u> warnings. Day 1 Tr. 20 lines 17-25; Day 2 Tr. 31 lines 2. Defendant did not give consent
for the search. Day 1 Tr. 49 lines 1-20. Defendant asked what would happen to the passenger of
the car and to the minor sitting in the backseat. <u>Id</u>. 21 lines 1-24; 48 lines 7-8. Casul-Claudio
explained that the passenger— Defendant's partner— would be taken to the police station and the
PRPB would contact the Department of the Family regarding the minor. <u>Id</u>. 21 lines 1-24; 27 lines
3-7; 47 lines 22-25; 48 lines 1-14. Defendant then told him that he had a firearm behind the driver's
seat. <u>Id</u>. 21 lines 1-24; 48 lines 7-8. Defendant also informed that he was on probation. <u>Id</u>. 22 lines
1-2. Defendant was placed under arrest. <u>Id</u>. lines 5-6. This part of the intervention took another
five minutes. Day 2 Tr. 18 lines 7-14.

Around five to ten police officers and four police cars participated in the intervention. Day
1 Tr. 96 lines 9-22. During the intervention, Defendant did not request the presence of counsel.
Neither did he do so at the police station. <u>Id</u>. 26 lines 1-6, 20-24. The USPO was notified of the
intervention around noon and less than one hour later arrived at the scene to perform a search of
the vehicle. <u>Id</u>. 22 lines 5-21; 68 lines 10-15; 69 lines 23-25; 90 lines 21-25; 96 line 1. Defendant
told USPO Rivera that the handgun was underneath the driver's seat. <u>Id</u>. 102 lines 6-25. A search
of the vehicle was conducted by the USPO. <u>Id</u>. 23 lines 1-11; 70 lines 10-25. The search took
approximately one hour. <u>Id</u>. 78 lines 7-9. Defendant did not ask the USPO for the presence of
counsel. <u>Id</u>. 72 lines 1-2. A firearm and ammunition were seized from inside a bag underneath the
driver's seat. <u>Id</u>. 76 lines 24-25; 101 lines 9-13; 105 lines 19-23.

The photometer unit of the PRPB arrived at the intervention while the search of the vehicle
was underway. The windows were tested after completion of the search. <u>Id</u>. 23 lines 18-25; 24
lines 1-4. The windows tints were darker than allowed by law. <u>Id</u>. 24 lines 6-9; Government Exhibit
1 at Docket No. 50-1. A traffic ticket for the tinted window violation was issued at the police
station. Day 1 Tr. 30 lines 12-19; Government Exhibit 3.

After being read his <u>Miranda</u> rights in the police station, Defendant again inquired as to
what would happen to the passenger of the car and the minor, and again informed Casul-Claudio
that the firearm was his. Day 1 Tr. 27 lines 1-9. Defendant wrote the following on the back of the
<u>Miranda</u> form: "The gun taken from inside the Mitsubichi Haulander car [  ] is mine; her and the
girl have nothing to do…. The bag is also mine; she doesn't know nor has nothing to do. Everything

**United States v. Vázquez**
**Criminal No. 22-322 (RAM)**
**Report and Recommendation**

that was inside the bag is mine." Id. 28 lines 5-14. Government Exhibit 2 at Docket No. 50-1.
Defendant did not mark the waiver portion of the <u>Miranda</u> form but signed the form. Government
Exhibit 2 at Docket No. 50-1.

Defendant was then interviewed by TFO Rodríguez. Day 1 Tr. 114 lines 15-22. Prior to
the interview, Casul-Claudio told TFO Rodríguez that Defendant made an admission after
receiving <u>Miranda</u> warnings. Id. 147 lines 15-19; 148 lines 13-16. Present in the interview room
were TFO Rodríguez and another agent. Id. 115 lines 1-8. Defendant was handcuffed. Id. at 115
lines 1-8. <u>Miranda</u> rights were read. Government Exhibits 18-18-A. Defendant was asked whether
he understood his rights. He understood. Government Exhibit 18-A at pp. 3-4. The following
exchange followed:

| | |
|---|---|
| Agent: | Now, I am going to read you the second part of the document. It says: waiver, I have read this declaration of my rights, or it has been read to me and I understand my rights. At this time I am willing to answer the questions without an attorney present. No pressure, promises, or force of any kind has been used against me. I am asking you now, Alan [sic]. I already have the version of the police. Are you going to give us your version? |
| Defendant: | What version? |
| Agent: | Of what happened. |
| Defendant: | That is mine, my version? It was mine. |
| Agent: | What is yours? |
| Defendant: | The weapon |

Government Exhibit 18-A at p. 3. TFO Rodríguez asked Defendant to sign the <u>Miranda</u> form
acknowledging that he was willing to talk to law enforcement and "sign in agreement to tell us
what you just told us." Id. p. 5. Defendant refused. Exhibit 18-A at 5.[1] Defendant did not ask to
speak to an attorney. Day 1 Tr. 120 lines 22-24. Defendant appeared upset but alert, was not
intoxicated, was aware of his surroundings, and made eye contact. Id. 115 lines 23-25; 116 lines
1-7. Defendant also seemed to have understood his rights. Id. 116 lines 18-20.

---

[1]      The Government requested an extension of time to submit English translations of
documents submitted in evidence. The Government failed to submit an English translation of Government
Exhibit 19. The Court relies on the transcript of the interview at Government Exhibit 18-A.

United States v. Vázquez
Criminal No. 22-322 (RAM)
Report and Recommendation

### III.    Discussion

### A.    Defendant's Credibility

Defendant testified during the hearing. However, his account of the chain of events differs in significant respects from the accounts of Casul-Claudio and USPO Rivera.

First, Casul-Claudio testified that, it was not until after the K-9 unit marked on the vehicle and he gave Defendant the Miranda warnings, that Defendant admitted to the firearm in the car. Defendant testified that he asked about the potential consequences for the passenger and the minor and admitted to the firearm prior to the K-9 sniff and the Miranda warnings. Day 2 Tr. 14 lines 4-7; 15 lines 6-17; 17 lines 1-4. Second, Casul-Claudio testified that at no point in time Defendant requested the presence of counsel. Defendant testified that he asked Casul-Claudio twice during the intervention whether he could call counsel; once when he was ordered to step out of the car and again before the K-9 marked on the vehicle. Id. 12 lines 5-8; 15 lines 14-25. Defendant also testified that at the police station he again asked whether he could call his attorney to no avail. Id. 22 lines 20-24. Third, Defendant testified that on several occasions during the intervention Casul-Claudio asked him whether there was anything illegal in the vehicle. Id. 9 lines 7-12; 11 lines 2-6; 13 lines 24-25. Casul-Claudio denied having made any such inquires. Fourth, USPO Rivera testified that she spoke to Defendant when she arrived at the site of the intervention and before conducting the search of the vehicle. USPO Rivera further testified that Defendant admitted that there was a firearm in the vehicle. Defendant denied having spoken to USPO Rivera after their meeting in the USPO office. Id. 31 lines 14-22.

The foregoing contradictions are all significant and material to the Court's analysis and recommendation. The Court is thus tasked with making a credibility assessment of Casul-Claudio, USPO Rivera, and Defendant. After watching the demeanor of Casul-Claudio and USPO Rivera, the undersigned deems them to have been credible. Defendant's credibility, however, is lacking. In the Statement under Penalty of Perjury submitted by Defendant at Docket No. 33-1, Defendant declared in no uncertain terms that "[n]o Miranda warnings were provided." During his testimony, Defendant admitted under oath that verbal Miranda warnings were provided. Day 2 Tr. 30 lines 15-25; 31 lines 1-2. This admitted falsehood fatally undermines the testimony of Defendant generally. It also severely impacts the Court's ability to rely on Defendant's testimony with respect to the rest of the intervention.

5

United States v. Vázquez
Criminal No. 22-322 (RAM)
Report and Recommendation

B.    The Traffic Stop

The Fourth Amendment prohibits unreasonable searches and seizures in the absence of a warrant supported by probable cause. U.S. Const. amend. IV. A Fourth Amendment seizure occurs when a police officer restrains the liberty of a citizen through physical force or show of authority. United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). "To determine whether an officer has restricted an individual's freedom of movement, courts determine the 'coercive effect of the encounter' by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter'". Id. at 725 (citations omitted). The Court evaluates the totality of circumstances to determine whether a seizure has occurred. Id.

A seizure without a previous warrant is unreasonable unless it falls under one of very limited exceptions. One of such exceptions is the Terry stop. Under Terry v. Ohio, 392 U.S. 1 (1968), a warrantless stop may be reasonable if the officer suspects that the person apprehended is committing or has committed a crime. Camacho, 661 F.3d at 726; United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006). The inquiry is two-fold: "whether the officer's action was justified at its inception, and whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. A reasonable suspicion is necessary. Id. at 28; United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012); United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014). Reasonable suspicion is more than a hunch but less than probable cause. Howard, 66 F.4th at 44; Camacho, 661 F.3d at 726 (citation omitted); Jones, 700 F.3d at 621 (reasonable suspicion is an intermediate standard; its assessment depends on a practical, commonsense judgment based on the particular facts of each case). The suspicion must be "objectively reasonable" and "grounded in specific and articulable facts". Camacho, 661 F.3d at 726 (citation omitted); Terry, 392 U.S. at 21-22. The Government bears the burden of showing that a reasonable suspicion justified the stop. Monteiro, 447 F.3d at 43. The Court evaluates the totality of circumstances. Howard, 66 4th at 44; Camacho, 661 F.3d at 726 (citation omitted); Jones, 700 F.3d at 621.

Defendant asserts that law enforcement lacked reasonable suspicion to stop him because the stop was a pretext to investigate Defendant's connection with a shooting in Cayey. But the evidence  established: (1) that Casul-Claudio observed that the tinted windows of the vehicle

6

driven by Defendant appeared to exceed the legal limit (and did exceed the legal limit), and (2) that, once the vehicle was stopped, Defendant informed that he did not have a valid driver's license. There is no question that the apparent illegality of the tinted windows was enough to justify the stop at the inception. United States v. Maldonado-Peña, 4 F.4th 1, 23 (1st Cir. 2021). The fact that Defendant did not possess a valid driver's license incremented the reasonable suspicion that existed in the first instance. United States v. Tanguay, 918 F.3d 1, 5 (1st Cir. 2019) (failure to produce license enough for reasonable suspicion); United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008) ("as the investigation proceeds, the officer 'may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.'") (citations omitted).

Defendant faults law enforcement for having an ulterior motive for the stop and using the tinted windows as a pretext. Defendant cites to the fact that the USPO had been informed of Defendant's suspected involvement in criminal behavior and that Defendant was under surveillance by the PRPB, including upon leaving the USPO office on the day of the intervention. Casul-Claudio denied having previous knowledge that Defendant was on probation or to have spoken with the USPO prior to the intervention. Day 1 Tr. 43 lines 12-19. He also denied having had surveilled Defendant that day but admitted that he knew other police officers had been surveilling Defendant. Id. 44 lines 22-24; 51 lines 15-17. There is also no dispute that police officers who were investigating Defendant were present at the intervention, including Lieutenant Aponte. Id. 47 lines 12-17. Be that as it may, the law is clear that "[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996). The U.S. Supreme Court in Whren established that the "constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officer involved." Id. The First Circuit has followed suit by holding that an officer's subjective intentions or motives for the stop are of no consequence. See Tanguay, 918 F.3d at 4 (citation and quotations omitted); United States v. Favreau, 886 F.3d 27, 30 (1st Cir. 2018) (citing Whren, 517 U.S. at 813). If there is reasonable suspicion that a traffic violation occurred— as there was in this case— the stop may be legal regardless of whether the stop was initiated as an excuse to investigate other criminal conduct. Maldonado-Peña, 4 F.4th at 23 (citation and quotation omitted).

United States v. Vázquez
Criminal No. 22-322 (RAM)
Report and Recommendation

The inquiry under <u>Terry</u> does not end with a finding of reasonable suspicion. For the warrantless stop to be valid, "the scope of the detention must be carefully tailored to its underlying justification." <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983) (citations omitted). To find that it was, the stop must have been "temporary and last no longer than necessary to effectuate the purpose of the stop" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." <u>Id</u>. The Government again bears the burden. <u>Id.</u> at 497 (citations omitted). Defendant argues that law enforcement impermissibly extended the duration and scope of the stop by repeatedly asking Defendant whether there was anything illegal in the car, by asking Defendant to step out of the car and not simply giving Defendant a citation or traffic ticket, and by waiting for the K-9 unit to arrive.

Defendant testified that, after not providing a driver's license, Casul-Claudio asked him on several occasions whether there was anything illegal in the vehicle. Day 2 Tr. 9 lines 7-12; 11 lines 2-6; 13 lines 24-25. Casul-Claudio denied having asked any such questions. Day 1 Tr. 40 lines 19-21; 47 lines 18-21; 48 lines 3-24. As explained earlier, Defendant's credibility has been tarnished for submitting a false statement under penalty of perjury with respect to the supposed absence of <u>Miranda</u> warnings at the intervention. But in any event, asking such questions — whether there is anything illegal during the stop — is not *per se* unreasonable under <u>Terry</u>. During a <u>Terry</u> stop, law enforcement is allowed to check the driver's license, determine whether there are any outstanding warrants, and inspect the vehicle registration and proof of insurance. <u>See</u> <u>United States v. Martin</u>, 395 F.Supp.3d 756, 760 (S.D.WestVa. 2019) (<u>citing</u> <u>Rodríguez v. United States</u>, 575 U.S. 348, 356-57 (2015) and other citations that are omitted). Law enforcement is also allowed to ensure that vehicles in public roads are operated "safely and responsibly". This includes by asking whether there is anything illegal in the car that could compromise the officer's safety. <u>Id</u>. (asking if there is anything illegal is related to officer safety and to the mission of a traffic stop). To the extent that any such questions do not unreasonably prolong the stop (and the stop in this case did not last more than 10 minutes), these questions are not offensive to the Fourth Amendment. <u>See</u> <u>e.g.</u>, <u>United States v. Nieves</u>, 256 F.Supp.3d 133, 137 (D.P.R. 2017) (ten-minute delay for dog to arrive did not turn stop unreasonable); <u>United States v. García-Sanjurjo</u>, 2021 WL 4839905, at *9 (D.P.R. July 7, 2021) (citing string of First Circuit cases for the same proposition).

United States v. Vázquez
Criminal No. 22-322 (RAM)
Report and Recommendation

Defendant also asserts that the stop was unreasonably prolonged when Casul-Claudio asked Defendant to step out of the vehicle. Defendant was asked to step out of the vehicle after being stopped for the illegally tinted windows and expressing that he did not have a driver's license. While it is true that Casul-Claudio testified that a "normal" traffic intervention could take several minutes (Day 1 Tr. 37 lines 13-25), it is not less true that the vehicle driven by Defendant was in the public road and that neither Defendant nor the passenger could drive it any further. The fact that Defendant did not possess a driver's license in and of itself was sufficient to increase the scope of the investigation. United States v. Dion, 859 F.3d 114, 124-125 (1st Cir. 2017). Furthermore, it is well settled that ordering a person to step out of the car is a minimal imposition that does not unreasonably extend a traffic stop. United States v. Henderson, 463 F.3d 27, 45–46 (1st Cir. 2006) (citing and discussing Pennsylvania v. Mimms, 434 U.S. 106 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures.") and Maryland v. Wilson, 519 U.S. 408 (1997) (same for passengers)); United States v. Coplin, 463 F3d 96, 102 (1st Cir. 2006) (requiring the driver of a car lawfully stopped for a suspected traffic violation to step out of his vehicle is a rule grounded in legitimate concerns for officer safety; officers authorized to order driver out of the car pending the completion of their investigation into the suspected traffic violation). Defendant was stopped for a legitimate traffic violation and a second traffic violation was discovered at the time of the stop. Casul-Claudio could order Defendant to step out of the car without unreasonably prolonging the traffic stop. See e.g., Maldonado-Peña, 4 F.4th at 23 (tinted window violation, officer could order suspect out of the car); United States v. Tiru-Plaza, 766 F.3d 111, 117 (1st Cir. 2014) (no driver's license, reasonable to ask suspect to get out of the car).

Defendant next contends that the stop was unreasonably prolonged when Casul-Claudio waited for the K-9 unit to sniff the vehicle. Casul-Claudio called the K-9 unit before intervening with Defendant. Day 1 Tr. 19 lines 2-3. He did so to corroborate a confidential tip that Defendant was involved in a recent shooting. Id. 35 lines 1-6. Nonetheless, Casul-Claudio did not testify as to the reliability of the tip.[2] No doubt "[a] seizure that is justified solely by the interest in issuing

---

[2]    Information provided to police by a third party may create reasonable suspicion if it contains sufficient indicia of reliability. Jones, 700 F3d at 621. When relying on an informant for reasonable

a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.". Illinois v. Caballes, 543 U.S. 405, 407 (2005). But a dog sniff alone does not unreasonably prolong an otherwise lawful stop. Id. at 405, 408-409 ("In our view, conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed respondent's constitutionally protected interest in privacy."). The U.S. Supreme Court in Rodríguez clarified that a dog sniff of a car stopped for a traffic violation is not part of the mission to complete issuing a ticket for the traffic violation and for that reason cannot last longer than necessary to effectuate the purpose of the traffic stop. Rodríguez, 575 U.S. at 352-354 (dog sniff occurred after traffic ticket had been issued). "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the dog sniff prolongs or adds time to the stop." Id. at 357. The K-9 unit in this case arrived within several minutes of the traffic stop. Day 1 Tr. 19 lines 4-6; 54 lines 7-10. When the K-9 unit marked on the vehicle, Defendant had yet to be given the traffic ticket. Id. 55 lines 11-16. According to Defendant, the K-9 marked within 10 minutes of the stop. Day 2 Tr. 18 lines 7-14. The time reasonably required to complete the traffic stop included both the time to issue the illegal window tint warning (which required corroboration by the photometer and occurred more than one hour after the Defendant's admission and the search of the car (Day 1 Tr. 23 lines 18-25; 24 lines 1-9)) and resolving Defendant's (and the passenger's) inability to drive the car in a public road. The dog sniff, which occurred within minutes of the stop, did not unlawfully prolong the stop under Rodríguez. See e.g., United States v. Johnson, 2021 WL 1060215 *17-18 (D.S.D. 2021).

### C.  The Incriminating Statements

Pursuant to the Fifth Amendment of the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Premised on this constitutional right, the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 444 (1966) held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of

---

suspicion, the Government "must provide some information from which a court can credit the informant's credibility." United States v. White, 804 F.3d 132, 136 (1st Cir. 2015) (citation omitted).

procedural safeguards effective to secure the privilege against self-incrimination." United States v. Lugo Guerrero, 2005 WL 8163207, at *6 (D.P.R. Oct. 14, 2005). The procedural safeguards under Miranda require that the suspect be adequately and effectively appraised of his rights, and that the exercise of those rights be honored by law enforcement. Missouri v. Seibert, 542 U.S. 600, 608 (2004). To be sure, Miranda not only requires that the suspect be informed of his rights but that police cease questioning immediately upon the assertion of rights. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Therefore, the Fifth Amendment privilege against self-incrimination requires that, prior to questioning a suspect, the police appraise the suspect of his right to remain silent and to have counsel present during questioning, that counsel could be appointed free of charge, and of the state's intention to use any of his statements to secure a conviction. Moran v. Burbine, 475 U.S. 412, 420 (1986) (discussing Miranda, 384 U.S. at 468-470, 473-474).

Defendant insists that his first admission was made prior to the dog sniff and the Miranda warnings. Day 2 Tr. 17 lines 1-4. But, as discussed above, the credible evidence established a different timeline. Defendant's admission came after receiving the Miranda warnings. Defendant's arguments with respect to a *de facto* arrest, prior to the moment in which he received the Miranda warnings and made his admission, have been addressed and rejected above with a finding that the traffic stop was not unreasonably prolonged. See United States v. Cruz-Rivera, 14 F.4th 32, 48-50 (1st Cir. 2021) ("[w]here an investigatory stop is justified at its inception […], it will generally not morph into a de facto arrest as long as 'the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop.'") (citations and quotations omitted). Because Defendant made his first admission after receiving Miranda warnings, the Court examines whether Defendant waived his rights under Miranda voluntarily, knowingly, and intelligently. Moran, 475 U.S. at 421 (citation and quotation omitted).

The Court is required to presume that a defendant did not waive his Miranda rights. United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003) (citation omitted); United States v. Carpentino, 948 F.3d 10, 26 (1st Cir. 2020). The burden is on the Government to prove a valid waiver by the preponderance of the evidence. Id.; Colorado v. Connelly, 479 U.S. 157, 168 (1986); Carpentino, 948 F.3d at 26. The inquiry is two-fold: (1) the relinquishment of rights must be a free and deliberate choice, absent intimidation, coercion, or deception, and (2) the waiver must be made

United States v. Vázquez
Criminal No. 22-322 (RAM)
Report and Recommendation

with full awareness of the nature of the rights being abandoned and of the consequences of such abandonment. Moran, 475 U.S. at 421 (citations omitted); Carpentino, 948 F.3d at 26. Casul-Claudio testified that Defendant was given verbal Miranda warnings. Defendant then inquired about would happen to the passenger and the minor, and Casul-Claudio answered that the passenger would be taken to the police station and that steps would be taken with the Department of the Family regarding the minor. Day 1 Tr. 21 lines 1-7. Defendant then admitted to the firearm in the car. Id. lines 18-24. Casul-Claudio testified that Defendant was asked, prior to making the admission, whether he understood his rights and that he confirmed that he did. Id. lines 12-17. Defendant has not asserted that he did not know or understand his rights. There is thus no question that Defendant knowingly waived his Miranda rights. Defendant attacked the voluntariness of his waiver by testifying that he felt pressured and surrounded at the time of the intervention, that he felt he could not leave and that the only way to avoid trouble for the passenger and minor in the car was to make the admission. Day 2 Tr. 12 line 10; 16 lines 11-20; 21 lines 10-13. But feeling pressured alone is insufficient. There is no evidence of coercion. Connelly, 479 U.S. at 167; United States v. Boskic, 545 F.3d 69, 78 (1st Cir. 2008) (police coercion is a necessary element for a finding involuntariness in waiving rights under Miranda). And the fact that Defendant may have been moved by a potentially unfavorable outcome for the passenger and the minor[3] does not amount to coercion. See United States v. Hufstetler, 782 F.3d 19, 24 (1st Cir. 2015) ("[W]ithout more, an officer's truthful description of the family member's predicament is permissible"); see also United States v. Jacques, 744 F.3d 804, 809-810 (1st Cir. 2014) (promise of more favorable treatment – spending time with his family, especially his sick father – or threat of harsher prison sentence without more are not enough for finding of coercion).

We now turn to Defendant's post-arrest statements.[4] Defendant was interviewed by Casul-Claudio at the police station. The evidence showed that, after being read his Miranda rights for a second time, Defendant again inquired as to what would happen to the passenger of the car and

---

[3]    Defendant testified that he felt pressured by the fact that the passenger and the minor could suffer negative consequences if he did not confess. Day 2 Tr. 14-17.

[4]    In his post-hearing brief, Defendant made no independent arguments for the suppression of his post-arrest statements at the police station. However, because arguments as to those were made in the motion to suppress at Docket No. 29, I address the legality of those statements here.

the minor, and informed Casul-Claudio that the firearm was his. Day 1 Tr. 27 lines 1-9. Casul-Claudio testified that Defendant understood his rights and did not ask for the presence of counsel. Id. 26 lines 2-24. Defendant made a written admission on the back of the Miranda form. Id. 28 lines 5-14. Government Exhibit 2 at Docket No. 50-1. Defendant testified that he understood his rights. Day 2 Tr. 36 lines 16-17. He also testified that he felt stressed but was not confused or under the influence of any substance. Id. 39 lines 14-21; 40 lines 6-7. Defendant did not introduce any evidence or make any arguments in the post-hearing briefs that the waiver of his Miranda rights on the second interview was not knowing and voluntary.

The second interview at the police station was with TFO Rodríguez. Day 1 Tr. 114 lines 15-22. Prior to the interview, Casul-Claudio told TFO Rodríguez that Defendant made an admission after receiving Miranda warnings. Id. 147 lines 15-19; 148 lines 13-16. Present in the interview room were TFO Rodríguez and another agent. Id. 115 lines 1-8. Defendant was handcuffed. Id. at 115 lines 1-8. Miranda rights were read. Government Exhibits 18-18-A. Defendant was asked whether he understood each of his rights and he answered in the affirmative for each. Government Exhibit 18-A at pp. 3-4; Day 1 Tr. 116 lines 18-20. Indeed, Defendant testified that he understood his rights. Day 2 Tr. 42 lines 3-25. When asked whether he would be providing a statement, Defendant asked for clarification and immediately admitted that the firearm was his. Government Exhibit 18-A at 4. Defendant did not ask to speak to an attorney. Day 1 Tr. 120 lines 22-24. Defendant refused to sign the waiver portion of the Miranda form. Government Exhibit 18-A at p. 5. But Defendant's refusal to sign a waiver form is not a broad invocation of right to counsel. See 2 LaFave, Criminal Procedure at § 6.9(g) (refusal to sign a waiver of rights form is not conclusive proof that suspect invoked right to counsel); United States v. Oehne, 698 F.3d 119, 123 (2d Cir. 2012). Defendant's post-arrest statements should not be suppressed.

## IV.    Conclusion

For the reasons discussed above, Defendant's motion to suppress at Docket No. 29 should be **DENIED.**

### IT IS SO RECOMMENDED.

This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed within fourteen (14) days of its receipt. Failure to file timely and specific objections to the

**United States v. Vázquez**
**Criminal No. 22-322 (RAM)**
**Report and Recommendation**

Report and Recommendation is a waiver of the right to review by the District Judge and of appellate review. <u>Thomas v. Arn</u>, 474 U.S. 140, 154-155 (1985); <u>Davet v. Maccorone</u>, 973 F.2d 22, 30-31 (1st Cir. 1992).

In San Juan, Puerto Rico, this 14th day of June 2024.

<u>s/Giselle López-Soler</u>
GISELLE LÓPEZ-SOLER
United States Magistrate Judge